## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **WASHINGTON STREET, LLC,**<br><br>*Plaintiff,*<br><br>v.<br><br>**NATIONWIDE PROPERTY & CASUALTY INSURANCE COMPANY,**<br><br>*Defendant.* | **Case No. 2:21-cv-04374-JDW** |

## <u>MEMORANDUM</u>

Like Philadelphia basketball fans, insureds who submit a claim to their insurer are told to "trust the process." The process should lead to better, more reasonable results: a contending basketball franchise; and reasonable, timely decisions claim resolutions by insurers. If a basketball franchise doesn't have a good process, it faces an economic consequence because fans will vote with their feet and their pocketbooks. If an insured doesn't follow a good process in responding to a claim, it faces an economic consequence in the form of liability.

In this case, Washington Street LLC claims that Nationwide Property & Casualty Insurance Company's process failed it. Nationwide, on the other hand, says that it didn't do anything unreasonable and that Washington Street didn't suffer any harm. In effect, "no harm, no foul." Having reviewed the record, the Court agrees with Nationwide. Its

handling of Washington Street's claim was by no means a model of perfection, but it wasn't so bad as to constitute bad faith, either under Pennsylvania's insurance bad faith statute or the common law. The Court will grant Nationwide's Motion for summary judgment.

## I.      BACKGROUND

Washington Street owned 37-39 W. Washington Street, Chambersburg, Pennsylvania. On July 14, 2019, a fire damaged the property. Washington Street had a commercial insurance policy (the "Policy") with Nationwide and reported the fire loss. Nationwide appointed John Matthews to administer the claim. In July 2019, when it became clear that a tenant's negligent cooking started the fire, Mr. Matthews made a subrogation referral. Nationwide appointed Steven Payne, an attorney, to handle any subrogation action.

### A.      Administration Of Claim

In August 2019, Washington Street notified Nationwide it had retained counsel, Girard Rickards, to handle its claim. Mr. Rickards told Nationwide that Washington Street was losing $4,350 in rental income every month and that Washington Street would "cooperate" in subrogation efforts. Later that month, Mr. Rickards complained about the pace of the investigation and asked Nationwide for a claim estimate.

On September 3, 2019, Nationwide sent Washington Street its first claim estimate and paid $376,342.95. Nationwide explained that the estimate did not include "a number

of open items pending quotes from qualified contractors." (ECF No. 22-6 at Ex. F.) Nationwide also noted that the estimate was "far short of the policy limit" and that, "[a]s repairs progress, any additional damages found will be paid as a supplement." (*Id.*)

Washington Street remained frustrated with Nationwide's investigation. In October 2019, Washington Street sent Nationwide its own estimates for HVAC, electrical repair, mold remediation, roof repair, masonry, partial demolition, and asbestos removal. Gary Shetter, Washington Street's Nationwide agent, reviewed Washington Street's estimates and asked Mr. Matthews, the claims administrator, whether Nationwide should just declare the property a total loss. Mr. Matthews explained Nationwide would not do so unless the damage exceeded the Policy limits, and he was still investigating the loss value.

On November 14, 2019, Nationwide told Washington Street it had retained a consultant to evaluate the claim. Once the consultant completed his investigation, in January 2020, Nationwide estimated the full value of the claim to be $635,898.86. Based on this estimate, Nationwide paid Washington Street $208,555.91, bringing its total payment to $584,907.68. Washington Street could collect the remaining value of the claim when it submitted proof of repairs.

After receiving this estimate and payment, on March 12, 2020, Washington Street demanded appraisal. Washington Street and Nationwide each appointed an appraiser, and their appraisers selected an umpire. After Washington Street's demand, on April 3, 2020, Nationwide asked Mr. Rickards to provide an "itemized list of matters you intend to

submit to policy appraisal." (*See* ECF No. 23-32.) Mr. Rickards did not respond. On June 30, 2020, Nationwide sent another letter to Mr. Rickards saying it could not "resolve" the claim unless he responded. (*Id.*) On July 13, 2020, Nationwide sent a letter to Washington Street (not to Mr. Rickards) explaining it needed a response to its letter, even though Nationwide's preferred mode of communication, where an insured is represented by counsel, is through counsel.

On July 23, 2020, Mr. Rickards responded. He expressed frustration with Nationwide's letters because the appraisers had already begun the appraisal process. He explained "our appraisers have agreed upon a referee, have discussed their differing opinions and visited the property approximately six . . . weeks ago." (ECF No. 23-36.) He then explained that Washington Street's appraiser had been waiting to hear from Nationwide's appraiser since the site visit. Mr. Rickards emphasized that Nationwide did not need anything else to finish the appraisal.

The appraisal continued. On November 3, 2020, the appraisal umpire entered the award: $859,670.03 for dwelling loss; $7,720.05 for business personal property, $35,306.40 for debris removal, and $74,200 for loss of income. Nationwide issued supplemental checks to Washington Street up to its Policy limits. So, in total it paid: $854,700 for dwelling loss, $60,000 for business income, and $25,000 for debris removal. After the payments, Washington Street's underinsured and uninsured claims totaled $37,196.48. It had underinsured claims of $ 4,970.03 for dwelling loss, $14,200 for business income, and

$10,306.40 for debris removal; it had an uninsured claim of $7,720.05 for business personal property.

**B.     Policy Reformation**

In December 2019, Mr. Shetter realized that Washington Street's Policy did not include business income coverage. He informed Nationwide of the error and recommended reformation of the Policy to include $60,000 in business income coverage. Nationwide's Agency Support department investigated. On March 12, 2020, Agency Support recommended reformation. When Washington Street asked Mr. Shetter for an update in April 2020, Mr. Shetter learned that Agency Support approved the claim but Underwriting still needed to review it. On August 14, 2020, Mr. Shetter again asked for an update and expressed frustration with the pace of the investigation. In his words, "this entire claim by far is the worst I've experienced." (ECF No. 23-27.)

It is unclear when exactly the investigation finished and Nationwide reformed the Policy, but in September 2020, Nationwide asked Washington Street for the lease agreements to calculate the claim value. Washington Street provided the leases that same day. Nationwide approved the business income claim on November 25, 2020, and paid Washington Street the business income on December 11, 2020.

**C.     Subrogation Action**

Nationwide's subrogation team pursued a subrogation action against the tenant who started the fire. Nationwide filed that subrogation action against the tenant on June 3, 2020.

5

Nationwide included Washington Street's claim for its deductible in its cause of action. Nationwide did not inform Washington Street that it had filed the action. On October 9, 2020, the tenant sent Nationwide a "firm proposal for mediation." On January 14, 2021, after the appraisal process ended, Nationwide told Washington Street about the subrogation action and suggested that Washington Street join to protect its interests.

The tortfeasor had $500,000 in insurance coverage and proposed to settle all of the plaintiffs' claims on a *pro rata* basis. Each of the Parties to the action, including Washington Street, accepted a *pro rata* portion of the total settlement. While Washington Street received less than its total outstanding uninsured and underinsured claims, its counsel described its pro rata share as "fair and acceptable" when accepting the settlement. (ECF No. 22-12 at 3/5.)

### D.    Procedural History

Washington Street alleges that Nationwide acted in bad faith in handling its claims. Washington Street alleges its bad faith caused Ruth Jones, its sole member, to lose money in the subrogation action, to sell the property at a loss, and to suffer extreme economic harm. On October 5, 2021, Nationwide removed this case to federal court. After discovery, Nationwide moved for summary judgment. That motion is ripe for review.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). The movant is entitled to judgment as a matter of law when the non-moving party fails to make such a showing. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A plaintiff may not rely on evidence to overcome summary judgment that would not be admissible at trial. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

## III.   ANALYSIS

### A.   Statutory Bad Faith

Under Pennsylvania law, "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may" award various damages. 42 Pa. Cons. Stat. § 8371. The statute does not define "bad faith," but the Pennsylvania Supreme Court has defined bad faith to be "any frivolous or unfounded refusal to pay proceeds of a policy." *Rancosky*, 170 A.3d 364, 365 (Pa. 2017) (quoting *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)). To recover on a statutory bad faith claim, the claimant must show by clear and

convincing evidence that the insurer (1) lacked a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded the lack of basis for the claim denial. *Id.* at 376–77 (citing *Terletsky*, 649 A.2d). Proof of an insurer's motive of self-interest or ill-will is probative of the second prong but is not required. *Id.* at 377. Negligence or bad judgment is not bad faith. *See Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (quoting *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. Super. Ct. 2004)).

Nationwide paid Washington Street the full Policy limits, so Washington Street points to Nationwide's actions (and inactions) during the claims process as evidence of bad faith. Specifically, Washington Street alleges that Nationwide delayed the investigation of the claims; delayed reformation of the Policy; made low-ball offers; misrepresented and delayed the appraisal process by demanding additional documentation; and put its own interests first with the subrogation suit. None of these actions, considered individually or as a whole, amounts to statutory bad faith

### 1.  Pre-appraisal & reformation of the policy delays

Delay is relevant in determining whether an insurer acted in bad faith, but "a long period of delay between demand and settlement does not, on its own, necessarily constitute bad faith." *Seto v. State Farm Ins. Co.*, 855 F. Supp. 2d 424, 430 (W.D. Pa. 2012). Courts consider whether "the delay is attributable to the defendant," whether "the defendant had no reasonable basis for the actions it undertook which resulted in the

delay," and whether "the defendant knew or recklessly disregarded the fact that it had no reasonable basis to deny payment." *Thomer v. Allstate Ins. Co.*, 790 F. Supp. 2d 360, 370 (E.D. Pa. 2011) (quoting *Wiedinmyer v. Harleysville Mut. Ins. Co.*, No. 94–19450, 1999 WL 1324202 at *215 (Pa. Com. Pl. Aug. 5, 1999)). Courts have also drawn a distinction between an insurer delaying necessary tasks and an insurer delaying settlement when the value of the claim is clear. *See Williams v. Hartford Cas. Ins. Co.*, 83 F. Supp. 2d 567, 572 (E.D. Pa. 2000), *aff'd*, 261 F.3d 495 (3d Cir. 2001). The former, without more, is not bad faith, while the latter often is. *See id.*

Nationwide's pre-appraisal investigation into the value of the claim might not have been as fast as Washington Street wanted, but it was not so delayed that a reasonable juror could find Nationwide knew or recklessly disregarded the fact that it had no basis to deny payment. The property had extensive damage, and the value of the claim was unclear. When Nationwide provided its initial estimate in September, it informed Washington Street that certain items were outstanding and required further investigation. From September to January, Nationwide hired a business consultant and investigated the value of open items (HVAC, electrical repair, mold remediation, roof repair, masonry, partial demolition, and asbestos removal). That Nationwide took a little over two months to hire a consultant, and then an additional two months to investigate the damage, is not so lengthy it as to qualify as reckless. This is particularly so given the scope of damage.

Nationwide's delay between December 2019, when Mr. Shetter identified the business income issue, and December 2020, when Nationwide approved the payment of business income coverage, was also not reckless. There was a reason that payment took so long: Nationwide had to investigate whether it needed to reform the Policy and investigate the value of the claim. The simple fact that Nationwide's Agency Support and Underwriting teams took eleven months to finish these tasks, without more, does not make its actions bad faith. *See Williams*, 83 F. Supp.2d at 571–72 (fifteen-month delay insufficient to prove bad faith).

Nationwide probably could have been more diligent. Certainly, Nationwide was slow to complete tasks. But Washington Street has not demonstrated that Nationwide's lack of alacrity demonstrates a reckless disregard for the unreasonableness of its actions. *See id.* at 572. Nationwide had to investigate to determine if it needed to reform the policy, no aspect of its investigation was so lengthy it amounted to recklessness. *See id.*

## 2.  Low offers

An insurer's estimate is not bad faith if it is low, as long as the insurer has a reasonable basis for the estimate. *See Brown*, 860 A.2d 493, 501 (Pa. Super. Ct. 2004) (citing *Terletsky*, 649 A.2d at 688–689). Nationwide did not act in bad faith in making its estimates because it had a reasonable basis for every offer it made. For its first offer, Nationwide investigated the loss, created an itemized estimate of damages, and paid Washington Street $376,342.95. For its next estimate, Nationwide brought in and relied

on a consultant to value the outstanding items. At the close of the consultant's investigation, Nationwide updated its estimates and paid an additional $208,555.91, bringing the total to $584,907.68. The fact that Nationwide conducted investigations, created itemized estimates to provide a clear accounting, and relied on an expert suggest that Nationwide had a reasonable basis for its estimates.

Washington Street points to the fact that Washington Street, and later the appraiser umpire, valued the claim higher. But that is not enough. Where the value of a claim is unclear—as it was in this matter—the fact that experts differed in their estimates is reasonable. Washington Street also highlights that Nationwide excluded certain items from its initial estimate. If anything, estimating the value of items Nationwide could not estimate would be unreasonable. Nationwide informed Washington Street that the estimate excluded items, it investigated those items further, and updated its estimation when it had more information. None of this evidence amounts to clear and convincing evidence that Nationwide acted recklessly in making its estimates.

### 3. Request for additional documentation before appraisal

There was nothing improper about Nationwide's request that Washington Street provide "an itemized list of matters" for appraisal. (*See* ECF No. 23-1 at 16.) Given the scope of damage to the property, Nationwide's request to focus the precise scope of Washington Street's appraisal request is far from reckless.

Washington Street argues Nationwide misrepresented the Policy and delayed the resolution of Washington Street's claims by requesting the itemized list. While Washington Street is correct that the Policy does not require an itemized list, the Policy also does not bar it. So, Nationwide was permitted to ask for a list to streamline the appraisal process. Nationwide's request also did not significantly delay the appraisal process. Nationwide sent the letters to Washington Street in April, June, and July. While it waited for a response, Nationwide began the appraisal process. Nationwide appointed an appraiser, its appraiser agreed on a referee, and its appraiser visited the property with Washington Street's appraiser. As best the Court can tell, the maximum delay that Nationwide's request caused was six weeks from the appraisers' site visit to the day Washington Street refused to provide an itemized list. Nothing about that delay constitutes the sort of unreasonable conduct that rises to bad faith under Section 8371. And, once Washington Street refused to provide the itemized list, Nationwide continued the appraisal process. Finally, Washington Street complains that Nationwide sent its letter requesting the itemized list to Washington Street and its counsel. Maybe that violated Nationwide's policies and procedures, but it does not amount to recklessness.

### 4.    Subrogation claim

Nationwide's handling of the subrogation action does not suggest that it put its own interests before Washington Street's, even if Nationwide violated the made whole doctrine and the made whole doctrine applied to the Parties' contract.

*First*, there is no evidence before the Court that Nationwide's pursuit of subrogation impacted its investigation into Washington Street's claims. Different teams at Nationwide oversaw Washington Street's claims and the subrogation action. Washington Street points to no evidence that Nationwide's subrogation action influenced Nationwide's handling or evaluation of Washington Street's claims or the timing of Nationwide's payments. Without any connection to Nationwide's handling of Washington Street's claim, Washington Street has not provided evidence that Nationwide's pursuit of subrogation suggests it handled Washington Street's claim recklessly.

*Second,* there is no evidence that Nationwide tried to give itself an advantage over Washington Street in the subrogation action. When Nationwide learned, after appraisal, that Washington Street would have underinsured claims, Nationwide notified Washington Street about the subrogation action. Washington Street cannot point to prejudice from the delayed notice. Washington Street joined an action, settled it, and received "a fair and acceptable" portion of the tortfeasors $500,000 policy limit. (ECF No. 22-12 at 3/5.) An insurer "need not show that the process used to reach its conclusion was flawless." *Mann v. UNUM Life Ins. Co. of Am.*, No. 02-1346, 2003 WL 22917545, at *7 (E.D. Pa. Nov. 25, 2003).

Washington Street suggests that Nationwide's failure to tell Washington Street about the tortfeasor's mediation offer in October 2020 prejudiced it, though it does not explain how. Washington Street does not allege it suffered in the mediation process or

was otherwise disadvantaged. In other words, even if Nationwide filed the action too soon, there is no evidence, let alone clear and convincing evidence, it did so to elevate its interests over its insured and prejudice Washington Street in the subrogation action, nor that doing so had such an impact on Washington Street.

Washington Street also argues that Nationwide's filing of the subrogation action, in and of itself, constitutes bad faith because it violated the made whole doctrine and breached the Policy. The made whole doctrine requires "an insured recover the full amount of its losses before an insurer may pursue recovery under its subrogation rights." *Professional Flooring Co. v. Bushar Corp.*, 152 A.3d 292, 302 (Pa. Super. Ct. 2016); *see Jones v. Nationwide Prop. & Cas. Ins. Co.*, 32 A.3d 1261, 1270–72 (2011).

Washington Street cites no binding caselaw for its argument that a violation of the made whole doctrine violates the bad faith statute. To the contrary, the Pennsylvania Supreme Court has held that the **only** way to establish bad faith is the *Terletsky* test. *See Rancosky*, 170 A.3d at 376–77 (citation omitted). Because the *Terletsky* test alone establishes bad faith, it follows logically that violations of other rules or tests cannot *per se* establish it. The Third Circuit, in an unpublished opinion, rejected a similar argument when it held that violations of the Uniform Insurance Practice Act cannot *per se* establish bad faith. *See Dinner v. United Servs. Auto. Ass'n Cas. Ins. Co.*, 29 F. App'x 823, 827 (3d Cir. 2002); *Slupski v. Nationwide Mut. Ins. Co.*, No. CV 18-3999, 2021 WL 2948829, at *4

(E.D. Pa. July 14, 2021); *see also Toy v. Metropolitan Life Ins. Co.*, 863 A.2d 1, 14 (Pa. Super. Ct 2004). This aligns with the Court's analysis of the issue, and the Court finds it persuasive.

In short, a violation of the made whole doctrine cannot *per se* establish bad faith. As a matter of equity, the Court also questions whether Washington Street could rely on a violation of the made whole doctrine at all given it settled this matter and does not allege fraud or duress leading up to settlement.

### 5.    Actions as a whole

Even considered as a whole, Nationwide did not act in bad faith. Nationwide had a reasonable basis for taking so long to get this matter wrapped up. There was extensive damage and Nationwide had to investigate a host of different issues. Even as some of its investigations progressed slowly, there is no evidence it knew or recklessly disregarded the lack of basis for the claim denial. Nationwide did not act as quickly Washington Street might have hoped. But at the end of the day, Washington Street got the funds Nationwide owed it in due course. Therefore, Nationwide did not act in bad faith.

### B.    Common Law Bad Faith

For common law bad faith, the insured may recover known and foreseeable compensatory damages that flow from the insurer's breach of the insurance contract's implied duty of good faith. *See Birth Ctr. v. St. Paul Cos., Inc.*, 787 A.2d 376, 379 (Pa. 2001). Pennsylvania law is somewhat unclear whether it will permit a common law bad faith claim for the denial of first party insurance benefits. The decision in *Birth Center* involved a claim

for third party benefits and turned on an insurer's refusal to settle litigation that it was defending. The parties have not identified a case that addresses whether the cause of action that the Supreme Court permitted in *Birth Center* would apply in a claim like this one for first party benefits. But even assuming that such a claim could exist, Washington Street has not mustered enough evidence to present such a claim to the jury in this case.

### 1.    Compensatory damages

Where an insurer commits common law bad faith, the insurer is "liable for the known and/or foreseeable compensatory damages of its insured that reasonably flow from the bad faith conduct of the insurer." *Id.* at 379. Washington Street argues that Nationwide's mishandling of the subrogation action resulted in Washington Street receiving less than the full value of its loss; Nationwide's delays impacted Washington Street's decision to sell the property; and Nationwide's delays caused extreme economic hardship. (Washington Street also makes a passing reference to an inability to pay its mortgage, but it makes no argument about that, nor does it cite to any record evidence, so the Court does not consider it.) None are known or foreseeable compensatory damages.

*First,* Washington Street alleges that Nationwide mishandled the subrogation action, which resulted in Washington Street receiving less than the full value of its loss. Washington Street seems to suggest that it could have received more from the tortfeasor had Nationwide filed the subrogation action later or notified Washington Street of the

16

action sooner. But Washington Street alleges no prejudice from its late addition to the action. It does not allege that it joined on the eve of trial or was forced into a particular litigation strategy. In fact, the record shows the opposite. Washington Street knew Nationwide would pursue a subrogation from the outset. And when it joined the subrogation action, albeit later than Nationwide, Washington Street consented to a settlement that it described as "fair and acceptable." (ECF No. 22-12 at 3/5.) Washington Street could have rejected or challenged the settlement. It did not. The evidence before the Court suggests that the settlement portion it received flowed from Washington Street's own risk-benefit analysis, not Nationwide's handling of the action.

*Second,* Washington Street argues that Nationwide's delay increased mold on the Property, which in turn "impacted" Washington Street's decision to sell the property at a loss. (ECF No. 23-1 at 24.) Washington Street has presented no evidence that it would have or could have remediated the mold had Nationwide paid Washington Street the full sum earlier. In addition, Washington Street sold the building because "the cost of repairs were so high to bring the building to code." (*See* ECF No. 23-42 at 86–87.) The mold was only one component of those repairs. No evidence bears on how the mold growth impacted the sale price. The Court therefore cannot infer that the delay caused the mold and the mold caused Washington Street to sell the property at a loss.

*Third,* Washington Street argues that Nationwide's delay in adjusting and paying the loss "severely impact[ed] Ms. Jones' financial security" and caused Franklin County to

threaten fines and legal action. (ECF No. 23-1 at 24–25.) There's no evidence in the record to support those contentions, though. Nor is there any evidence showing that Washington Street suffered an economic injury as a result. Washington Street might have been unhappy to be under financial stress, but absent some evidence of a financial loss, there is nothing for the Court to do.

## IV.  CONCLUSION

Nationwide's claims process was by no means perfect. Hopefully, it will use this case as a teaching moment to tighten its procedures so that its insureds can trust its process. But no evidence before the Court suggests that Nationwide's conduct was negligent, let alone reckless, such that it could support a claim of bad faith. The Court will therefore grant Nationwide's summary judgment motion. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
**JOSHUA D. WOLSON, J.**

November 18, 2022